**No. 24-30628**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**CHANDRE' CHANEY**
*Plaintiff – Appellant*

**VERSUS**

**BOARD OF SUPERVISORS OF LOUISIANA
STATE UNIVERSITY AND AGRICULTURAL AND
MECHANICAL COLLEGE THROUGH LOUISIANA
STATE UNIVERSITY HEALTH SCIENCES CENTER**
*Defendant – Appellees*

_____

**On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:22-cv-00016**

_____

**ORIGINAL BRIEF FILED ON BEHALF OF THE
PLAINTIFF-APPELLANT, CHANDRE' CHANEY**

_____

Respectfully submitted,

J. Arthur Smith, III (#07730)
**SMITH LAW FIRM**
830 North Street
Baton Rouge, L 70802
Telephone: (225) 383-7716
Facsimile: (224) 383-7773
E-mail: jasmith@jarthursmith.com

December 9, 2024

i

## I. CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record respectfully certifies that the following listed persons have an interest in the outcome of this case.

Plaintiff-Appellant:                        Chandre' Chaney

Counsel for Plaintiff-Appellant:            J. Arthur Smith, III – SMITH LAW FIRM

Defendant-Appellees:                        Board of Supervisors of Louisiana State University and Agricultural and Mechanical College through Louisiana State University Health Sciences Center

Counsel for Defendant-Appellees:            Renee Culotta – FRILOT, LLC


_____*/s/ J. Arthur Smith, III*_____
J. Arthur Smith, III
*Attorney of Record for Plaintiff, Chandre' Chaney*

## II.    STATEMENT REGARDING ORAL ARGUMENT

Counsel for the Plaintiff-Appellant respectfully requests that oral argument be granted in this case. Counsel believes that oral argument would allow for a full discussion of the legal issues and the factual record and may assist the Court in resolving the issues presented by this appeal.

## **TABLE OF CONTENTS**

I.     CERTIFICATE OF INTERESTED PERSONS ……………………….ii

II.    STATEMENT REGARDING ORAL ARGUMENT ………………….iii

III.   TABLE OF AUTHORITIES……………………………………...vi

IV.    STATEMENT OF JURISDICTION………………………………... 1

V.     STATEMENT OF ISSUES PRESENTED FOR REVIEW………….. 1

VI.    STATEMENT OF THE CASE…………………………………………2

VII.   SUMMARY OF THE ARGUMENT…………………………………..21

VIII.  STANDARD OF REVIEW……………………………………………..21

IX.    ARGUMENT …………………………………………………………21

       1.    Summary Judgment Standards ………………………………… 21

       2.    Title VII Standards ……………………………………………...25

       A.    The District Court Erred in Concluding that the
             Plaintiff Failed to Prove that there Exists Genuine
             Issues of Material Fact as to Pretext in this case ……………… 27

       B.    The District Court Essentially Treated this Case
             as a Reduction in Force Case, but the Defendant
             Failed to Prove why Dr. Chaney was Chosen
             for Termination and Others who were not
             Members of a Protected Group were Retained…………………31

       C.    The District Court Improperly Weighed
             the Evidence, Crediting Defendant's
             Evidence, and Discrediting Plaintiff's Evidence,
             which Conflicts with *Reeves v. Sanderson
             Plumbing Products, Inc.,* supra…………………………………41

X.    CONCLUSION …………………………………………………..43

XI.    CERTIFICATE OF SERVICE …………………………………... 45

XII.    CERTIFICATE OF COMPLIANCE …………………………..45

## III.   TABLE OF AUTHORITIES

### <u>Federal Cases</u>

*Am. Home Assurance Co. v. U. S. Alliance*,
378 F.3d 482, 486 (5th Cir. 2004) …………………………………………… 22

*Bauer v. Albermarie Corp*., 169 F.3d 962, 966 (5th Cir. 1999) ………………32

*Burton v. Freescale Semiconductor, Inc.*,
789 F.3d 222, 240 (5th Cir. 2015) ………………………………………… 40

*Byers v. Dallas Morning News, Inc.*,
209 F.3d 419 (5th Cir. 2000) ……………………………………………… 26

*Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017)…………………... 30

*Cantu v. Vitol, Inc.*, 2011 U.S. Dist. LEXIS
118325 (S.D. Tex., Dec. 21, 2009) ………………………………………...40

*Conti v. Storage Technology Corporation*,
304 F.3d 336 (4th Cir. 2002) ……………………………………………… 36

*Ctulla v. Rigny,* 89 F. Supp. 2d 97, 101-02 (D. Mass. 2000) …………………..25

*Diaz v. Eagle Produce Limited Partnership*,
521 F.3d 1201 (9th Cir. 2008) ……………………………………………... 35

*Dimick v. Schiedt*, 293 U.S. 474, 486,
55 S. Ct. 296, 79 L. Ed. 603 (1935) ……………………………………… 24

*EEOC v. Chevron-Phillips Co*.,
570 F.3d 606 (5th Cir. 2009) ……………………………………………… 22

*Flowers v. Crouch-Walker, Corp.*,
552 F.2d 1277, 1283 (7th Cir. 1977)……………………………………… 40

*Harville v. City of* Houston,
945 F.3d 870, 875 (5th Cir. 2019) ………………………………………… 26

*Harvill v. Westward Commun., L.L.C.*,
433 F.3d 428, 436 (5th Cir. 2005) …………………………………………… 23

*Hunt v. Cromatrie*, 526 U.S. 541 (1999) …………………………………… 42

*Jarkesy v. SEC,* 34 F. 4th 446, 451; (5th Cir. 2022) …………………………… 23

*Marzano v. Computer Science Corp., Inc.*,
91 F.3d 497 (3rd Cir. 1996)……………………………………………………... 32

*McCoy v. City of Shreveport*,
492 F.3d 551, 557 (5th Cir. 2007) …………………………………………… 26

*McDonnell Douglas v. Green*,
411 U.S. 792, 93 S. Ct. 1817, (1973) …………………………………………... 38, 40

*Owens v. Excel Management Services, Inc.*,
2004 WL 358153 (N.D. Tex, 2004)…………………………………………… 32

*Parklane Hosiery Co., Inc. v. Shore*,
439 U.S. 322, 341, 99 S. Ct. 645,
58 L. Ed. 2d 552 (1979) …………………………………………………………... 23

*Porter v. Houma Terrebonne Housing Authority*
*Bd. of Comm'rs*, 810 F.3d 940, 942 (5th Cir. 2015) ………………………… 23

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir.2004) ……………….....41

*Raggs v. Mississippi Power and Light Co.,*
278 F. 3d 463, 471 (5th Cir. 2002)……………………………………………… 27

*Reeves v. Sanderson Plumbing Co.*
530 U.S. 133 (U.S. 2000) …………………………………...……………….22, 39, 41

*Smith v. Aaron's Inc.*, 325 F. Supp. 2d 716, 724 (E.D. La. 2004)……………...26

*Stennett v. Tupelo Pub. Sch. Dist.*,
619 F. App'x 310 (5th Cir. 2015) …………………………………………….30, 31

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502, 113 S. Ct. 2742 (1993) ……………………………………….. 39

*Tolan v. Cotton*, 134 S.Ct. 1861, 1867-68 (2014) ……………………………22, 30

*United States v. Marshall*, 798 F. 3d 296, 305 (5th Cir. 2015)………………..21

*United States v. Johnston*, 258 F.3d 361, 373 (5th Cir. 2001) ………………..25

*Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990) ………………………….. 32

*Vaughn v. Woodforest Bank*, 665 F. 3d 632 (5th Cir. 2011)…………………... 39

*Wellogix, Inc., v. Acenture*, L.L.P.,
716 F.3d 867, 874 (5th Cir. 2013)……………………………………………. 22

## **Federal Statutes**

Fed. R. Civ. P. 59(e)……………………………………………………….. 1

28 U.S.C. § 1291…………………………………………………………... 1

28 U.S.C. § 1981 ………………………………………………………….. 27

## **Secondary Sources**

Administrative Office of the United States Courts,
"Federal, Judicial Caseload Statistics, Table C-4," (2023) ………………….. 24

*Larson*, Employment Discrimination at § 12.10 ……………………………..35

Symposium, The Vanishing Trial, 1
J. Empirical Legal Stud. 459 (2004) …………………………………………… 25

1 A. de Tocqueville, *Democracy in
America* 29 (H. Reeve text 1945) …………………………………………..25

## IV.     STATEMENT OF JURISDICTION

This is an appeal pursuant to 28 U.S.C. § 1291 from a final judgment of the United States District Court for the Middle District of Louisiana dated December 20, 2023,[1] granting the Motion for Summary Judgment filed by Defendant, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, through Louisiana State University Health Sciences Center[2], herein after ("LSUHSC") and for the denial of Plaintiff's Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e)[3]. Plaintiff timely filed this appeal on October 1, 2024.[4]

## V.     STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)     Whether the District Court erred in determining that there are no genuine issues of material fact regarding pretext;

(2)     Whether the District Court improperly weighed the evidence and improperly credited Defendant's evidence on the Defendant's Motion for Summary Judgment; and

(3)     Whether there are genuine issues of material fact that must be resolved by a jury.

---

[1] ROA. 1477.
[2] ROA 1449-76.
[3] ROA. 1523-30.
[4] ROA. 1531-32.

1

## VI.   STATEMENT OF THE CASE

### A. Statement of Facts

Dr. Chandre' Chaney was a dedicated and professional employee at LSU Health Sciences Center ("LSUHSC") during her employment from September 1, 2019 to September 10, 2020. She was committed to the work of the Louisiana Cancer Prevention and Control Program ("LCP") and improving the work environment. She received high praise from the Center for Disease Control ("CDC") for her work on the colorectal grant application and her swift attention to revising the budget. On her last day at work, the Assistant Director of the LCP and the Principal Investigator of the Colorectal Cancer Grant, Randi Kaufman, emailed the staff and stated, "Chandre' did an amazing job of finding new partners for this cycle of the colorectal grant. She exceeded our goals and expectations."[5] However, Chandre' had also reported a culture of racial discrimination within the program to the University. In response, LSU discriminated and retaliated against her by terminating her employment because of her race.

Dr. Chandre' Chaney, an African American woman, is a former employee of Louisiana State University Health Sciences Center ("LSUHSC") in New Orleans.[6] LSUHSC hired Dr. Chaney from September 1, 2019 until her sudden and wrongful

---

[5] ROA. 1116.
[6] ROA. 10.

termination in September of 2020.[7] She served as a Program Manager for the Louisiana Cancer Prevention ("LCP") & Control Programs.[8] Dr. Chaney's assignment was to work for the Colorectal Center Grant.[9]  She reported to Dr. Randi Kaufman ("Dr. Kaufman"), the Assistant Director and the Principal Investigator of the Colorectal Grant Center.[10] When she was hired, Donna Williams was the Director of LCP. Dr. Chaney reported to Ms. Williams during the last month of her employment.[11] Dr. Chaney received satisfactory performance reviews during her employment with LSUHSC.[12] Despite her key role in management of the colorectal program and her stellar performance, on August 11, 2020, LSUSHC notified Dr. Chaney that her employment would end on September 10, 2020.[13] Dr. Kaufman informed Dr. Chaney that her position was being eliminated.

Dr. Chaney contends that she was subjected to a hostile work environment because of her race and was discriminated against and harassed because of her race by employees at LSUSHC, Dr. Randi Kaufman, Dr. Donna Williams, Ms. Megan Fraser, Mr. Nick Payne, and Ms. Jasmine Meyers.[14]

---

[7] ROA. 10.
[8] ROA. 10.
[9] ROA. 10.
[10] ROA. 10.
[11] ROA. 10.
[12] ROA. 1117-1132.
[13] ROA. 392-394.
[14] ROA. 12.

The discrimination started early in her tenure with LSUSHC in October of 2019.[15] The colorectal program owned a giant inflatable colon which weighed hundreds of pounds, which was used in the community to promote preventative colorectal screening.[16] Dr. Chaney and another African American employee, Ms. Natalie Hollingshed, had concerns with being able to access this colon when community partners were picking up and dropping off the colon, because the office in which it was held was often locked many times early in the morning or late in the evening when access was needed.[17]  Dr. Chaney and Ms. Hollingshed were attempting to come up with a solution because they were responsible for signing the colon in and out to the program's community partners.[18]  Via email, they asked for the key to the storage room housing the inflatable colon.[19]  Whitney (white) responded by saying, "My office is storing some expensive equipment so I would lean towards not making more keys for that door."[20]  Dr. Chaney felt offended that two black women could not be trusted to have a key in a room holding expensive equipment, and found her determination to be racially discriminatory.[21] Laura Ricks,

---

[15] ROA 1169.
[16] ROA 1169, 1171.
[17] ROA 1204-1205.
[18] ROA 12.
[19] ROA 12, 440-452.
[20] ROA 440-452.
[21] ROA 1197.

4

the communications manager, also got involved in the dispute about whether Dr. Chaney and Ms. Hollingshed would be given keys to access the inflatable colon.[22]

Adding insult to injury, the situation was brough up in a leadership team meeting shortly thereafter, but Dr. Chaney was cut off from speaking by Dr. Donna Williams.[23]  Dr. Williams allowed Laura Ricks (white), to share her side of the matter, but not Dr. Chaney, which was doubly offensive to Dr. Chaney.[24]  After the meeting, Dr. Chaney's supervisor, Dr. Kaufman made a very alarming statement. She told Dr. Chaney that Ms. Ricks was racist, but there was nothing that Dr. Kaufman could do about it.[25]

Regarding the issue, Toya Shanklin-Jackson, the Business Manager at LSUHSC, testified:

> "When we had a management meeting about it, I was limited in what I was allowed to say. Dr. Chaney was just outright dismissed and shut off. This happened on more than one occasion. They swept it under the rug without allowing my perspective, as the business manager where I used to have a key to the office. We send this inflatable colon out to various clinics, and we have office staff assisting with trying to pick it up, store it and make sure it's returned properly." [26]

Beginning in October of 2019 and continuing until the end of Dr. Chaney's employment, Ms. Megan Fraser would not cooperate with or support Dr. Chaney,

---

[22] ROA 440-452.
[23] ROA 1200.
[24] ROA 1200.
[25] ROA 1207-1208.
[26] ROA 1268, 737.

even though Dr. Chaney was her direct supervisor.[27]  Ms. Fraser (white) left Dr. Chaney's name from projects and documents that Dr. Chaney played a major role in creating.[28] Ms. Fraser did not interact with another African American woman named Natalie Hollingshed, on planning webinars, as her job duties entailed.[29] Ms. Fraser avoided Ms. Hollingshed and excluded her from planning meetings and emails.[30] When Dr. Chaney reported that she had difficulties working with Ms. Fraser in November 2019, Ms. Kaufman suggested that she visit the Campus Assistance Program ("CAP"), a counseling center for employees.[31]

In December of 2019, Dr. Chaney and Ms. Shanklin, both African American women, were asked to manage another African American woman, Ms. Hollingshed, even though Ms. Hollingshed's duties did not fall under either woman's supervisory roles.[32] Dr. Chaney was told that Ms. Hollingshed's previous manager, who was Caucasian, said that Ms. Hollingshed was "difficult to work with" even though Ms. Hollingshed had never been disciplined regarding the issue.[33]  At the time, Dr. Chaney and Ms. Shanklin were told they were being asked to manage Ms.

---

[27] ROA 1168.
[28] ROA 1320-1323.
[29] ROA 1320-1323.
[30] ROA 1320-1323.
[31] ROA 125.
[32] ROA 1212.
[33] ROA 1212.

Hollingshed because they "seemed cool with her" and had "things in common with her."[34]

In November of 2019, Dr. Chaney was told that her employees didn't trust her and that she needed to "build trust" with her employees.[35]  Dr. Chaney asked if there were instances where she acted or spoke in an untrustworthy manner, but none were provided.[36]

In November of 2019, Dr. Kaufman and Dr. Williams admitted in a leadership team meeting that they had an implicit bias against African American people.[37]

At a leadership team meeting, Dr. Chaney was subjected to racially offensive questions about stereotypical behavior attributed to black persons suggestive of a general implicit bias against them such as if she had ever smoked marijuana before or if she had ever been to jail.[38]

Toya Shankin-Jackson, the Business Manager at LSUHSC, also described the racial discrimination she has suffered during her employment.  She states: "…this is somewhat triggering for me…I was called—in the midst of an altercation where things were being said to me that were not true, going down the hallway, I was called a 'ni**er,' and it was overheard by other co-workers who...had their office doors

---

[34] ROA 1159, 1212.
[35] ROA 1159.
[36] ROA 1159-1161.
[37] ROA 1190.
[38] ROA 1209-1211.

open at the time…I became so upset."[39]   As a result of this incident, Ms. Shanklin was told she could take some time off if she needed it, but it was in her best interest to not pursue it.[40]

In January of 2020, an African American staff member who had been employed seventeen (17) years won a Civil Service award. This African American was not properly compensated until Civil Service required LSU to pay this employee an increase in salary.[41]

During her employment at LSUSHC, Dr. Chaney observed that Caucasian employees and African American employees were treated differently regarding leave. Caucasian employees did not always have to submit leave time, but African American staff members were required to submit time off requests and wait for approval.[42]   In January of 2020, Dr. Chaney asked a Caucasian employee that she supervised to provide a doctor's note after the employee missed five days of work and was told "people don't like being asked for proof."[43]   However, Dr. Chaney and other African American staff members were often reminded that they needed to bring a doctor's note upon their return to work when they were out sick.[44]

---

[39] ROA 1266.
[40] ROA 1272.
[41] ROA 1191.
[42] ROA 1188-1189, 1293.
[43] ROA 1188-1189, 1293.
[44] ROA 1188-1189, 1293.

On February 18, 2020, a Climate Survey came out for LSUHSC.[45]   Specific anonymous comments regarding race discrimination in the program included the following:

- "Having matters handled differently from white staff members; automatically deemed wrong in any situation without even having all facts examined for verified."

- "White employees are treated more favorably."

- "Have witnessed many microaggressions against black people.  A visiting speaker once said that Italian immigrants had the biggest lynching in Louisiana, which just is a lie."

-  "I've definitely witnessed some racism against people of color, particularly Black folks and students who don't speak English perfectly."

- "As previously stated, when you don't agree with the 'higher ups' it can be detrimental for you as I have witnessed 'clear divisions' within my department with African American staff members and White staff members where you may be the recipient of a look as if you are transparent and don't exist to clearly just being made to feel unimportant and labeled as 'defensive and angry' if you do speak up on any injustice and also being labeled as 'disengaged' if you choose not to stay."

- "anything with the hope of just 'keeping the peace' to get through the day. I have also witnessed 'side-bar' conversations where a particular African American staff member was referenced in an inappropriate manner and of course the other staff member was glorified or made to be presented as a 'victim' when that was CLEARLY not the case."

- "I have not reported the behavior because I know nothing will be done about it and am worried that I'll suffer other consequences."

---

[45] ROA 1324.

- "The only reason I am not specifying events here is because I worry about retaliation. All I can say is we have some very biased leaders here."

- "Report the behavior to whom??? Some other those who are in leadership that you would report the issue are sometimes the guilty party. There is not a transparent or rather outlined process for dealing with the offenders. Individuals are fearful of consequences due to reporting."

Further, on February 21 of 2020, Dr. Kaufman wrote an email to Dr. Chaney and other staff members and attached a PDF about white supremacy in the workplace titled "White Supremacy Culture." Dr. Kaufman wrote in the body of the email, "Interesting read. I see our program and myself in this. Let's talk about [sic] on a Tuesday." The PDF included a list of characteristics of Caucasian supremacy culture that show up in organizations, including defensiveness, power hoarding and fear of conflict.[46] In an environment where Dr. Chaney and other African American employees were already being disregarded, ignored, and disrespected, it was an alarming realization that her leadership felt that "white supremacy" was admittedly present in the organization within which she was employed.

Dr. Chaney was required to share sensitive budget documents with Mr. Payne and Ms. Fraser, though Caucasian managers were not asked to share these types of documents with the employees they supervised. Mr. Fraser and Ms. Payne provided offensive feedback to Dr. Chaney in person and through email, which Dr. Chaney

---

[46] ROA 484-494.

shared with Ms. Williams and Ms. Kaufman. Ms. Williams and Ms. Kaufman supported Mr. Payne's and Ms. Fraser's comments in these budget choice exchanges. Dr. Chaney found this to be racially offensive and she felt it undermined her authority.[47]

In April of 2020, Nick Payne transitioned to working in a new role on Ms. Meyer's team. He was splitting his time between multiple teams; however, he continued to report to Dr. Chaney.[48] By May 18 of 2020, Mr. Payne simply stopped sending Dr. Chaney weekly reports and began sending his weekly reports to only Ms. Meyer and Ms. Shanklin.[49]

In May of 2020, Dr. Chaney asked the two Caucasian women on the communications team, Ms. Ricks and Ms. Marmer, to complete a small task for the colorectal team. The communications team was given three weeks' notice but told Dr. Chaney they did not have time to complete the small task. This request was brought up at the next leadership team meeting, but Dr. Williams would not allow Dr. Chaney to share her side of the story in the leadership team meeting. However, Communications Manager Ms. Ricks (white) was allowed to speak and share her side.[50] This was the second time that Dr. Chaney was prohibited from speaking in

---

[47] ROA 1197-1198.
[48] ROA 1174.
[49] ROA 1174-1175.
[50] ROA 1202-1203.

front of a group of people, while a Caucasian employee was allowed to tell their side of the story.  This was offensive and humiliating to Dr. Chaney.

On June 1, 2020, Dr. Chaney asked for Mr. Payne's weekly report via email.[51] Mr. Payne replied that he did not report to Dr. Chaney and asked about the purpose of Dr. Chaney's record keeping.[52]  During this same time frame, Mr. Payne removed weekly check-ins with Dr. Chaney from his work calendar.[53]  Dr. Chaney shared these actions with Ms. Meyer and Dr. Kaufman and was verbally told "he must be going through something."[54]  Dr. Chaney observed that African American employees were deemed to be "difficult" whereas more compassion was shown to white employees under similar circumstances.

Dr. Chaney forwarded Mr. Payne's email to Ms. Kaufman on June 2, 2020. Ms. Kaufman replied that Dr. Chaney did not need Mr. Payne's records. Dr. Chaney wrote back that she did need the records and that she did not feel the need to explain everything to Mr. Payne.[55]  Ms. Kaufman replied that Dr. Chaney did not "have to explain everything."[56]  Ms. Kaufman also added, "And you [sic] almost done with him." Dr. Chaney replied that she was exhausted by the exchange and that she was looking "forward to hiring someone new."[57]  Ms. Kaufman replied "K."  Dr. Chaney

---

[51] ROA 472-475
[52] ROA 469.
[53] ROA 470-471.
[54] ROA 1167.
[55] ROA 472-475.
[56] ROA 269.
[57] ROA 472-475.

felt unsupported and undermined by Nick Payne and reported that she was very disappointed in how the situation was being handled to Dr. Kaufman.[58] As a black woman, Dr. Chaney did not feel valued or supported by her superiors or the employees she was supervising.

Dr. Chaney reported her issues with Nick Payne to Jasmine Meyers, Dr. Kaufman and to Dr. Williams.[59] She specifically told Jasmine Meyers that Mr. Payne's failure to treat her with respect had to do with her race.[60] On June 26, 2020, Jasmine Meyer sent Dr. Chaney an email about this situation, stating "I realize also that this situation didn't occur in a bubble, and that the ongoing conversations about racism w/o change are demoralizing both in the world at large and compounded within your workplace."[61] This email led Dr. Chaney to believe that Ms. Meyer agreed with Dr. Chaney that race was the issue with her co-employees. [62]

During this time, Dr. Chaney also spoke to her supervisor, Dr. Kaufman, telling her that it was her belief that Megan Fraser and Nick Payne don't treat her the same way as they treat other employees because of her race.[63] Dr. Chaney also raised this issue in management meetings more than once, wherein Ms. Meyers told the group that Megan and Nick don't treat her the same way "because we look

---

[58] ROA 472-475.
[59] ROA 1170.
[60] ROA 1170.
[61] ROA 1359.
[62] ROA 1170.
[63] ROA 1170.

different."[64] Dr. Chaney is certain that both Jasmine and Randi Kaufman were aware that she felt race was the issue with her treatment by Ms. Fraser and Mr. Payne.

In June of 2020, as a result of these ongoing discussions and Dr. Chaney's disappointment with her treatment by her co-workers, Dr. Chaney was referred again to the CAP. Ms. Kaufman told Dr. Chaney she was being referred to the CAP so that Dr. Chaney could learn how to deal with difficult colleagues. Dr. Chaney began seeing a counselor through the program.[65]

As outlined below, Dr. Chaney engaged in protected activity when reporting racial discrimination in the workplace, and LSUSHC retaliated by terminating her employment.

On June 8, 2020, during Dr. Chaney's initial counseling session, CAP counselor Scott Embley referred Dr. Chaney to Employee Relations so that Dr. Chaney could share her experiences of being treated poorly because of her race.[66] Mr. Embley stated this was an Employee Relations issue rather than a CAP issue. Dr. Chaney met with Ms. DeDeaux, Manager of Employee Relations, on June 11, 2020, but the University declined to pursue Dr. Chaney's complaint any further.

On June 10, 2020, Dr. Kaufman asked Dr. Chaney about her meetings with CAP, though the content of these meetings is protected by law. Ms. Kaufman became

---

[64] ROA 1170.
[65] ROA 1183.
[66] ROA 1345, 1167, 1219.

14

upset when Dr. Chaney shared that the CAP counselor referred her to Employee Relations.[67] Dr. Kaufman told Dr. Chaney that she was an "angry black woman." [68]

Dr. Kaufman instructed Dr. Chaney to take emotional intelligence courses, so Dr. Chaney enrolled in two emotional intelligence courses. Dr. Chaney completed the emotional intelligence courses I & II by June 25, 2020.[69]

Ms. Shanklin shared a similar experience with Dr. Chaney. She was sent to CAP for discussing pay inequities. She states: "I'm a business manager. I do business manager work, some programmatic work, help wherever I can, even do some job functions of other staff, and my pay was not suitable. And I was—again— I was, and I still am the lowest paid business manager. I work hard."[70]

Ms. Shanklin further states: "I'm talking about people that on the same salary grade as me. The it gets perceived that, when you ask a question, you're defensive, you're the, quote/unquote, 'angry black person.'…You can't win."[71] Ms. Shanklin was then recommended to go to CAP, which is supposed to be confidential. However, just like Dr. Chaney, Dr. Kaufman asked her to reveal what happened in CAP. [72]

---

[67] ROA 1195.
[68] ROA 1195-1196.
[69] ROA 833.
[70] ROA 1270.
[71] ROA 1271.
[72] ROA 1271.

From June of 2020 through September of 2020, Dr. Chaney continued to meet with Mr. Embley with CAP. Both Mr. Embley and Ms. DeDeaux documented Dr. Chaney's experiences by taking notes during the meetings.[73]   Ms. DeDeaux concluded that an investigation needed to be opened to learn more about possible racial discrimination at LCP.[74] However, Human Resources declined to open an investigation into whether racial discrimination was taking place at LCP. [75]

In August of 2020, Dr. Chaney was told that Ms. Williams, the director, was her new manager, rather than Dr. Kaufman, the Assistant Director.[76]  This change in supervision was made even though the Colorectal Manager had always reported to the Assistant Director in past management structures.

On August 11, 2020, Dr. Chaney was given 30 days' notice of termination.[77] Ms. Shanklin typically prepares termination documents for the LCP.[78]   However, Ms. Barattini prepared Dr. Chaney's termination paperwork.[79]   Ms. Shanklin was asked by Dr. Kaufman to review Dr. Chaney's termination letter for proper legal terminology the morning of August 11.[80]   In August of 2020, Dr. Kaufman shared

---

[73] ROA 1052.
[74] ROA 1219.
[75] ROA 1320-1323.
[76] ROA 10.
[77] ROA 394.
[78] ROA 1266.
[79] ROA 1279.
[80] ROA 1285.

with Ms. Shanklin that Dr. Chaney's termination was all Ms. Williams' fault as Ms. Williams did not care for Dr. Chaney."[81]

Dr. Chaney was wrongfully terminated in retaliation for engaging in protected activities. Whatever administrative device was used to terminate Dr. Chaney, there is evidence of discrimination in this case and that she was wrongfully terminated for engaging in protected activities. Her position as the Program Manager for the Louisiana Colorectal Health Project was not eliminated, nor does the Defendant's excuse of "restructuring" make any sense.  CDC requires notification of changes in key staff position within the grant, and Dr. Chaney's employer never informed the CDC of this change. In fact, LCP submitted her resume and her salary in the write up for the new budget of the grant application.[82] Toya Shanklin-Jackson, the business manager for the program, has had to prepare the form letter for the CDC for these purposes before.[83] After Dr. Chaney was terminated, Toya Shanklin was in a management meeting where the managers were told that if anyone asks what happened to Dr. Chaney, the team was to say "we're restructuring." [84]

Toya Shanklin-Jackson expressed her shock at the decision to terminate Dr. Chaney in light of her work for the University.  She states: "Dr. Chaney busted her a** in March, which we're getting shut down from COVID, to get the competitive

---

[81] ROA 19, 1282.
[82] ROA 1219-1221.
[83] ROA 1281-1282.
[84] ROA 1280-1281.

application in to get this grant refunded for five more years. She's doing her job. We're working together in conjunctions—everyone is navigating the COVID process. So what's going on here? But I already knew what was going on….If you have—again, if you disagree with Donna Williams on anything, you're going to get retaliation; it could be indirect, direct, virtually; it could be in any form or capacity. So when you speak up or have a disagreement with something, it's: Well,…we'll find a way to get rid of you."[85]

Adding insult to injury, in August of 2020, when news of Dr. Chaney's termination was shared, a Caucasian staff member asked Dr. Chaney if she was going to "get on food stamps" and sign up for Medicaid,[86] which Dr. Chaney found to be racially offensive.

In September of 2020, Dr. Chaney met with Dean Smith and told him how she had been treated after she reported treatment that she perceived as racial discrimination. Dr. Chaney also shared the details of her termination with Mr. Smith. Mr. Smith replied that he had been "hearing things about LCP." Mr. Smith told Dr. Chaney that he would investigate the matter, but Dr. Chaney did not hear anything further from him.[87]

### B.    Relevant Procedural History.

---

[85] ROA 1280.
[86] ROA 512.
[87] ROA 518.

After her termination, Dr. Chaney timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around November 10, 2020, alleging a violation of Title VII based on the same set of facts asserted herein, and received a Notice of Right to Sue on October 19, 2021.[88]

On January 10, 2022, Dr. Chaney filed suit against the Defendant in the United States District Court for the Middle District of Louisiana, alleging Title VII and 42 U.S.C. 1981 violations resulting from the hostile work environment, retaliation, and racial discrimination that led to her termination from LSUHSC.[89] On July 7, 2023, Defendant filed a Motion for Summary Judgment, arguing that (i) Dr. Chaney was not subjected to a hostile work environment; (ii) that her termination was not racially motivated; and (iii) that she did not face retaliation for her reports of racial discrimination.

On December 20, 2024, the District Court issued a ruling granting Defendant's Motion for Summary Judgment, finding that, even though Plaintiff has established her *prima facie* case of retaliation, the Defendants had proffered a legitimate, non-discriminatory reason for her termination.[90] The court further held that Plaintiff had failed to raise a genuine "issue of material fact with respect to Defendant's proffered legitimate, non-retaliatory reason" for terminating Dr. Chaney

---

[88] ROA 515.
[89] ROA. 9-21.
[90] ROA. 1463.

and that the Plaintiff had failed to prove pretext.[91] In response to Plaintiff's Title VII hostile work environment claim, the court held that the Plaintiff's allegations do not rise to the level of severity and pervasiveness required under Title VII.[92] Lastly, regarding Plaintiff's Title VII retaliation claim, the court held that the Plaintiff can establish a prima facie case of retaliation, but that the Defendant has presented a legitimate, non-retaliatory reason for terminating the Plaintiff.[93] Further, the court held that the Plaintiff failed to establish pretext showing that a discriminatory motive more likely motivated her employer's decision and that the Plaintiff failed to raise any issue of material fact with respect to Defendant's proffered legitimate non-retaliatory reasons for her termination.[94] On the same date, the District Court entered a final judgment in favor of the Defendant, and against Plaintiff.[95]

Plaintiff then filed a Motion to Alter or Amend the Judgment on January 17, 2024,[96] which was denied by the District Court on September 4, 2024.[97] The Plaintiff filed her Notice of Appeal on October 1, 2024.[98]

---

[91] ROA. 1466.
[92] ROA. 1468.
[93] ROA. 1474.
[94] ROA. 1474-1475.
[95] ROA. 1477.
[96] ROA. 1480 – 1483.
[97] ROA. 1523 – 1530.
[98] ROA. 1531.

For the following reasons, Dr. Chaney respectfully submits that the granting of Defendant's Motion for Summary Judgment and the denial of Plaintiff's motion to Alter or Amend Judgment were improper.

## VII.   SUMMARY OF THE ARGUMENT

The District Court correctly concluded that the Plaintiff had established a prima facie case of both discriminatory termination and retaliation. However, the District Court erred in connection with the adjudication of the pretext issue. There was direct evidence of pretext. Indeed, the Defendant's Business Manager, Toya Shanklin-Jackson, testified in her deposition that the Defendant's purported legitimate non-discriminatory reason (i.e. that the Plaintiff's position was eliminated due to "restructuring") was a "lie." No further evidence was necessary to create a genuine issue of material fact as to whether the "restructuring" claim was false and unworthy of credence and, therefore, a pretext.

## VIII.  STANDARD OF REVIEW

This Court's standard for the review of a grant of summary judgment is *de novo*. *United States v. Marshall*, 798 F. 3d 296, 305 (5th Cir. 2015).

## IX.   ARGUMENT

### 1.   <u>SUMMARY JUDGMENT STANDARDS</u>

In considering a motion for summary judgment, "[t]he court must draw all reasonable inferences in favor of the non-movant and may not make credibility

determinations…" *Wellogix, Inc., v. Acenture, L.L.P.,* 716 F.3d 867, 874 (5th Cir. 2013); *Reeves v. Sanderson Plumbing Co.* 530 U.S. 133 (U.S. 2000). That is, the Court should give credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is un-contradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves*, *supra*, at 151. On a motion for summary judgment, the evidence should be viewed in the light most favorable to the non-movant. See *Am. Home Assurance Co. v. U. S. Alliance,* 378 F.3d 482, 486 (5th Cir. 2004). A "district court cannot . . . weigh the evidence when deciding a summary judgment motion." *EEOC v. Chevron-Phillips Co.,* 570 F.3d 606 (5th Cir. 2009) and *Harvill v. Westward Commun., L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005). In *Hunt v. Cromatrie*, 526 U.S. 541 (1999), the United States Supreme Court held at 552- 53 that: "[S]ummary judgment in favor of the party with the burden of persuasion...is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." In *Tolan v. Cotton*, 134 S.Ct. 1861, 1867-68 (2014), the United States Supreme Court reiterated the importance of traditional summary judgment standards explaining that genuine disputes are generally resolved by juries as witnesses come to the case with their own perceptions, recollections and biases. The Court then held that "by weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary

22

judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* (internal citations omitted.) This Court emphasized the importance of *Tolan* in *Porter v. Houma Terrebonne Housing Authority Bd. of Comm'rs*, 810 F.3d 940, 942 (5th Cir. 2015).

The correct application of the summary judgment standard is also critical for preserving the linchpin of our civil justice system: the jury trial. When federal judges weigh evidence and make credibility determinations at the summary judgment stage, they are usurping the role of the jury, and further eroding the role of United States district courts in decision-making as our founders intended. Recently, this Court emphasized the importance of the jury trial as the anchor of our system of justice in *Jarkesy v. SEC*, 34 F. 4th 446, 451; (5th Cir. 2022), noting that:

> Thomas Jefferson identified the jury "as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution.' Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in* The Papers of Thomas Jefferson 267 (Julian P. Boyd ed., 1958).

Trial by jury is a "fundamental" component of our legal system "and remains one of our most vital barriers to governmental arbitrariness." *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), citing *Reid v. Covert*, 354 U.S. 1, 9-10, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957). "Indeed, '[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions…'" *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 341, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979)

(Rehnquist, J., dissenting) (quoting Leonard Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 (1960)). Because "maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence[,] . . . any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S. Ct. 296, 79 L. Ed. 603 (1935).

According to data compiled by the Administrative Office of United States Courts, of 8610 federal question civil rights employment cases terminated by U.S. district courts in 2023, only 123 reached a jury trial – just 1.4%.[99] The statistics are even worse for civil jury trials in general: in the entire United States, of 338, 792 civil cases, only 1510 cases reached a jury trial: a rate of .45%. *Id.*

As early as 2001, this Court had noted the shrinking number of trials and the larger debate as to whether courts considered it "error" for a case to reach the trial stage at all, favoring settlement, mediation, and summary judgment. Judge Patrick E. Higginbotham wrote in a concurring opinion:

> According to data compiled by the Administrative Office, each active Article III judge presided over an average of only nine civil trials last year; the median length of a civil trial was one or two days…. Despite mounting "case" filings, the number of civil and criminal trials has declined markedly over the past thirty years in all categories of cases.

---

[99] See Administrative Office of the United States Courts, "Federal, Judicial Caseload Statistics, Table C-4," (2023). Available at https://www.uscourts.gov/statistics/table/c-4/federal-judicial-caseload-statistics/2023/03/31 (see line 86 of the spreadsheet table, "Federal Question/Nature of Suit: Civil Rights/Employment").

*United States v. Johnston*, 258 F.3d 361, 373 (5th Cir. 2001) (citing Judith Resnik,

*Trial As Error, Jurisdiction As Injury: Transforming the Meaning of Article III,* 113

Harv. L. Rev. 924 (2000)).

However highly we view the integrity and quality of our judges, it is the judges' colleague in the administration of justice – the jury – which is the true source of the courts' glory and influence. The involvement of ordinary citizens in a majority of a court's task provides legitimacy to all that is decreed. When judges decide cases alone, they are "still surrounded by the recollection of the jury." 1 A. de Tocqueville, *Democracy in America* 29 (H. Reeve text 1945). Their voices, although not directly those of the community itself, echo the values and the judgments learned from observing juries at work. In reality, ours is not a system where the judges cede some of their sovereignty to juries, but rather where the judges borrow their fact-finding authority from the jury of the people. *Ctulla v. Rigny,* 89 F. Supp. 2d 97, 101-02 (D. Mass. 2000) (quoting *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 712 F.Supp. 994, 1004-06 (D. Mass 1989).

The improper application of the summary judgment standard by making credibility determinations and weighing evidence contributes to this phenomenon of the vanishing trial, undermining the cornerstone of our justice system. See, e.g. Symposium, The Vanishing Trial, 1 J. Empirical Legal Stud. 459 (2004).

### 2.    TITLE VII STANDARDS

A Title VII discriminatory termination claim generally requires a plaintiff to show that she is (1) a member of a protected group; (2) that she was qualified for the position; (3) that she was terminated from the position; and (4) that she was replaced by a person outside of the protected group or that she was terminated because of her race. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000). Thereafter, if the Plaintiff meets this burden, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Harville v. City of* Houston, 945 F.3d 870, 875 (5th Cir. 2019); See *Smith v. Aaron's Inc.*, 325 F. Supp. 2d 716, 724 (E.D. La. 2004). If the employer does so, the Plaintiff must show, by a preponderance of the evidence, that the employer's reason is pretextual. *Id.* at 876. "A plaintiff may establish pretext whether through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Smith v. Aaron's Inc.*, 325 F. Supp. 2d 716, 724 (E.D. La. 2004)*.

To set forth a prima facie case of retaliation under Title VII, a Plaintiff must show: (1) that she engaged in an activity protected by Title VII; (2) that her employer took an adverse employment action against her; and (3) that a causal link existed between the protected activity and the adverse action. *McCoy v. City of Shreveport*,

492 F.3d 551, 557 (5th Cir. 2007); *Raggs v. Mississippi Power and Light Co.,* 278 F.

3d 463, 471 (5th Cir. 2002). A similar burden-shifting analysis follows.

The elements of similar claims under 42 U.S.C. 1981 follow the same

analysis.

**A.     The District Court Erred in Concluding that the Plaintiff Failed to Prove that there Exists Genuine Issues of Material Fact as to Pretext in this Case.**

In opposition to the Defendant's Motion for Summary Judgment, Plaintiff

offered several arguments that Defendant's purported reasons for terminating

Chaney pretextual, including, the deposition testimony of Toya Shanklin-Jackson.

In its ruling, the Court stated as follows:

> Considering the entire record, the Court finds that the Plaintiff has failed to raise a genuine issue of material fact as to Defendant's proffered legitimate, non-discriminatory reason….Defendant has maintained that the reason for Plaintiff's termination was a business decision…Plaintiff's "circumstantial evidence" is largely based on her own subjective belief that her colleagues' conduct was racially discriminatory.  This is insufficient to create a factual dispute over pretext.[100]

Plaintiff respectfully submits that this holding is legally and factually

erroneous for several reasons.  First, Ms. Toya Shanklin-Jackson, the longtime

Business Manager at LSUHSCNO, testified in her deposition that, in a manager's

meeting shortly after Dr. Chaney's termination, it was said by Dr. Williams that if

---

[100] ROA. 1466-67.

anyone asked about why she was terminated, they were to say that it was based on "restructuring".[101]   Ms. Shanklin-Jackson testified that this stated reason for Dr. Chaney's termination was a "lie."[102]  This testimony is direct evidence of pretext and is more than sufficient to create a genuine issue of material fact as to the truth or falsity of the proffered legitimate non-discriminatory reason (i.e. "restructuring") given by the Defendant for Dr. Chaney's termination.

Toya Shanklin-Jackson also described the racial discrimination she suffered during her employment at LSUHSC.  She states:  "…this is somewhat triggering for me…I was called—in the midst of an altercation where things were being said to me that were not true, going down the hallway, I was called a 'ni**er,' and it was overheard by other co-workers who...had their office doors open at the time…I became so upset."[103]   As a result of this incident, University officials told Ms. Shanklin-Jackson that she could take some time off if she needed it, but it was in her best interest to not pursue it.[104]

Dr.  Chaney was wrongfully terminated in retaliation for engaging in protected activities. Whatever administrative device was used to terminate Dr.  Chaney (or to describe her termination), there is evidence of both racial discrimination and retaliation because she was terminated for engaging in protected activities. The

---

[101] ROA. 1280-1281.
[102] ROA. 1280-1281.
[103] ROA. 1266; ROA. 1272.
[104] ROA 1272.

Defendant cannot avoid compliance with Title VII simply by labelling.  Her position as the Program Manager for the Louisiana Colorectal Health Project was not eliminated, nor does the Defendant's excuse of "restructuring" make any sense.  The Center for Diseases Control ("CDC") requires notification of changes in key staff position within the grant, and Dr. Chaney's employer never informed the CDC of this change. In fact, LCP submitted her resume and her salary in the write up for the new budget of the grant application. [105]

The District Court erred in overlooking this evidence and giving no weight to this evidence.  It is clear that Dr. Chaney's belief that she was terminated due to racial discrimination and retaliation was not based on the Plaintiff's subjective beliefs, as suggested by the District Court.  These statements made by Toya Shanklin-Jackson create a factual dispute as to whether a "restructuring" was the true reason for her termination.

Further, in August of 2020, Dr. Kaufman shared with Ms. Shanklin-Jackson that Dr. Chaney's termination was all Ms. Williams' fault as Ms. Williams "did not care for Dr. Chaney."

Both of these items of evidence effectively counter the Defendant's assertion that there is no factual dispute and suggest that the reason for Dr. Chaney's termination was in fact influenced by an improper hidden motive.

---

[105] ROA. 1220.

This Court, in *Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310 (5th Cir. 2015), an age discrimination case, explained the plaintiff's burden on summary judgment as follows:

> Critically, at the summary-judgment stage, our ultimate question is not whether Stennett has 'proven' or 'established' that TPSD's proffered reasons are pretextual but rather only whether she has produced sufficient evidence to create a 'genuine issue' as to whether those reasons are pretextual. See *Jackson v. Cal-Western Packaging, Corp.*, 602 F.3d 374, 378 (5th Cir. 2010); see also *Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 203 (5th Cir. 2008) ("While the ultimate burden of proving discrimination remains with the plaintiff throughout the case, within the context of a summary judgment motion, 'the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext.'" (quoting *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991)).

Id. at 315-16 (emphasis supplied). "In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017).

Once a genuine issue of fact is raised, it must be resolved by the jury, as "reasonable inferences should be drawn in favor of the nonmoving party" at the summary judgment stage. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). "If a plaintiff produces sufficient evidence to create a genuine issue as to the falsity of the employer's proffered hiring rationale, then Reeves further instructs that this evidence may, together with the plaintiff's prima facie case, permit a fact finder to infer that

discrimination was the true reason behind the employer's decision." *Stennett*, 619 F. App'x at 317, citing *Reeves*, 530 U.S. at 148.

Thus, under *Stennett*, the question is whether a reasonable jury could find that the Defendant's proffered, non-discriminatory reasons for terminating Dr. Chaney were pretextual. Dr. Chaney respectfully submits that, considering the fact that the District Court correctly held that Dr. Chaney has established a prima facie case, and based on this testimony by Toya Shanklin-Jackson, a reasonable jury could disbelieve LSUHSC's claim that it terminated Dr. Chaney due to purported "restructuring." The *Stennett* Court held: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.'" *Stennett*, 619 F. App'x at 323 (quoting *St. Mary's Honor Center*, 509 U.S. at 511)).

**B.      The District Court Essentially Treated this Case as a Reduction in Force Case, but the Defendant Failed to Prove why Dr. Chaney was Chosen for Termination and Others who were not Members of a Protected Group Were Retained.**

The District Court acknowledged the fact that Jasmine Meyer, who is white and was also a Program Manager in the LCP and on the same level as Plaintiff, was not selected for the purported "restructuring" while Dr. Chaney was. This Court has adopted a specific test for the elements of a prima facie reduction in force case.

In *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990), this Court held where the case, "involves choosing employees to discharge with no plan to replace them, the fourth element of the prima facie case is, more appropriately, that after Vaughn's discharge others who were not members of the protected class remained in similar positions." *Id*. Thus, the elements of a race discrimination claim arising out of a reduction in force are:

1)     The Plaintiff belongs to a racial minority;

2)     He held a job for which he was qualified;

3)     He was fired;

4)     After he was fired, others who were not members of a protected group remained in similar positions.

*Vaughn v. Edel*, 918 F.2d 517, 522 (5th Cir. 1990); *Bauer v. Albermarie Corp*., 169 F.3d 962, 966 (5th Cir. 1999); *Owens v. Excel Management Services, Inc*., 2004 WL 358153 (N.D. Tex, 2004).

The common sense rationale of the fourth prong of this test and its harmony with the holdings of the Supreme Court was well explained by the court in *Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497 (3rd Cir. 1996). The court held:

> "Plaintiff argues, however, that the relevant inquiry is not whether other persons outside the protected class were terminated, but whether persons not in the protected class were retained. . . . ("The 'factual inquiry' ... is '[whether] the defendant intentionally discriminated against the plaintiff.'"). For obvious reasons, it is extremely difficult-- not to say impossible--to establish directly the motivation of one's

employer, or that of any third party.  See Id. at 716, 103 S.Ct. at 1482 ("All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult.... There will seldom be 'eyewitness' testimony as to the employer's mental processes.") There are exceptions, of course, such as when a plaintiff can produce the proverbial "smoking gun"--for instance, an internal memorandum instructing the personnel director not to hire persons belonging to a certain protected class.  But our legal scheme against discrimination would be little more than a toothless tiger if the courts were to require such direct evidence of discrimination.  As we explained in Chipollini, "we do not require direct proof of ... discrimination because it is often unavailable or difficult to find.... "Even an employer who knowingly discriminates on the basis of [protected status] may leave no written records revealing the forbidden motive and may communicate it orally to no one.' " . . .

As a result, most employment discrimination lawsuits seek to prove intent through inference.  In the typical case, the plaintiff attempts to establish the employer's motivation by a process of elimination.  In other words, because plaintiffs generally cannot present evidence affirmatively pointing to their employer's actual reason for taking certain action against them, they must instead try to show that no reason other than discrimination is plausible, and that accordingly discrimination must have been the reason.  To enable a jury to reach this conclusion, plaintiffs must establish three elements: (1) that their employer took an adverse employment action against them; (2) that the facts of the case are compatible with discrimination being the reason; (3) that the employer is unable to provide an alternative nondiscriminatory reason for the action, or that its stated reason is false.  Since there must be some reason for the employer's action and since no reason other than discrimination has been shown to be plausible, this scheme allows a jury to infer that discrimination must be the reason.

Jumping over this first hurdle, however, has important consequences. by meeting his or her prima facie burden, the plaintiff earns the right, as in a poker game, to require the employer to show its hand--that is, to offer an explanation other than discrimination why the employee suffered an adverse employment action.  It is as if plaintiff told the employer, "I cannot get into your mind to prove with certainty that you acted against me based on a discriminatory motive.  You, on the other

hand, know the reason why you acted against me. I have done the best I can, which is to show that discrimination could have been the motive. Therefore, it is your turn to prove me wrong by articulating the nondiscriminatory reason for your action." If the employer is unable to proffer a nondiscriminatory reason, plaintiff is entitled to summary judgment or judgment as a matter of law, as the case may be; if the employer proffers a reason and the plaintiff can produce enough evidence that the proffered reason is false, plaintiff has earned the right to present his or her case to the jury. . .

The second and fourth elements, that plaintiff was qualified and that other unprotected workers were retained, establishes that plaintiff was treated differently from his or her colleagues, and introduces a question: "Why?" In other words, it raises the question of what is distinctive about plaintiff that caused the employer to treat him or her differently from his or her colleagues. The first element, that she was in the protected class, identifies one possible answer, one condition in which she differs from her colleagues who were retained: her protected status. It does not necessarily demonstrate that her protected status is the reason why she was treated differently; but it makes it a plausible explanation, one that is compatible with the facts of the case.

At that point, the burden switches to the employer, who must proffer an alternative explanation for treating the plaintiff differently from those unprotected employees who were retained. Chief Justice (then Justice) Rehnquist explained the reason for placing that burden on the employer as follows:

A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reasons, based his decision on an impermissible consideration such as race. Furnco Construction Corp.

v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (1978). . .

Rather, the effect of our rule is that in every case where an employee in a protected class is laid off as part of a reduction in force while unprotected colleagues are retained, the employer may be compelled to state the nondiscriminatory reason--assuming there is one--for the action.

It is true that if plaintiff can then produce evidence to cast doubt on the employer's stated reason, the case should go to trial. But such is the nature of the evidentiary beast. Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this "is clearly a factual question,". . . summary judgment is in fact rarely appropriate in this type of case. Simply "by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.". .

We conclude that the test that this Court has articulated in the past to establish a prima facie case of employment discrimination in a reduction-in-force context properly advances the evidentiary scheme devised by the Supreme Court. . . ."

In *Diaz v. Eagle Produce Limited Partnership*, 521 F.3d 1201 (9th Cir. 2008),

the Court held that:

To suffice under McDonnell Douglas, an employer's explanation must explain why the plaintiff 'in particular'; was laid off. . .on its own, the explanation that Diaz was discharged as part of a general reduction in force fails this requirement. Workforce reduction explains why Eagle Produce laid off a group of its workers, but it does not explain why Diaz was chosen to be part of that group. Because no other explanation was given with respect to Diaz, Eagle Produce failed to satisfy its burden at stage two on his claim, and summary judgment was inappropriate.

In *Larson*, Employment Discrimination at § 12.10, the author states:

Layoffs prompted by the need for economic cutbacks superficially embody, by definition, a non-discriminatory justification. But all the economic justification in the world will be of no avail if the employer selects workers for layoff in a discriminatory pattern. The crucial issue remains as to whether members of protected groups are treated differently in the course of the layoffs. If so, and there is no legitimate non-discriminatory reason for the difference in treatment, liability will be found. . .

In general, selection of a plaintiff for layoff will be justified if the persons retained have better capabilities or qualifications or can perform more tasks. Other justifications include personality conflicts with other workers or with one's supervisor, poor job performance, and inability to do the job. . .

Careful adherence to systematic procedures designed to evaluate performance will help the employer's case.

In *Conti v. Storage Technology Corporation*, 304 F.3d 336 (4th Cir. 2002), the

court held that:

StorageTek argues that the court erred in denying its Rule 50(a) motion for judgment as a matter of law. It does not dispute that Conti established a prima facie case for gender discrimination. Rather, it asserts that Conti did not "present evidence that StorageTek's stated reason for the RIF [reduction in force] (to downsize and eliminate a layer of management) was false and that the real reason was her gender." StorageTek misstates Conti's burden. Conti was not required to show that StorageTek's reason for eliminating a layer of management was a pretext, she was required to show that the excuse given for choosing her for a demotion (her performance) was a pretext for discrimination. See Rummery v. Illinois Bell Tel. Co., 250 F.3d 554, 557 (7th Cir.2001) (explaining that "even if a reduction in force is otherwise legitimate (i.e. not simply an excuse to terminate [female] workers), a plaintiff may establish pretext by showing that the specific reasons given for including [her] in the reduction was pretextual.")(Emphasis added)

*Id*. at 340-341.

In the case sub judice, there is no evidence of any of the types of legitimate non-discriminatory justifications that have been held sufficient by the courts. Moreover, there is significant evidence that Dr. Chaney had stellar performance reviews. So what is the Defendant's reasoning for choosing to lay off Dr. Chaney, instead of Ms. Meyer? The Defendant has never answered this question. In fact a layoff plan was neither reduced to writing nor was notice of the layoff provided to Dr. Chaney.

The Defendant has completely failed to provide any explanation as to why Dr. Chaney was terminated, even though her salary was specifically included in the new budget decrease. This fact was seemingly overlooked or dismissed by both the Defendant and the Court, and no justification has been offered.

The CDC requires notification of changes in key staff position within the grant, and Dr. Chaney's employer never informed the CDC of this change or any issues that purposedly led to the "restructuring". In fact, LCP submitted her resume and her salary in the write up for the new budget of the grant application. Toya Shanklin-Jackson has had to prepare the form letter for the CDC for these purposes before, but she did not do so for Dr. Chaney.

Toya Shanklin-Jackson expressed her shock at the decision to terminate Dr. Chaney in light of her work for the University. She states:

"Dr. Chaney busted her a** in March, which we're getting shut down from COVID, to get the competitive application in to get this grant refunded for five more years. She's doing her job. We're working together in conjunctions—everyone is navigating the COVID process. So what's going on here? But I already knew what was going on….If you have—again, if you disagree with Donna Williams on anything, you're going to get retaliation; it could be indirect, direct, virtually; it could be in any form or capacity. So when you speak up or have a disagreement with something, it's: Well,…we'll find a way to get rid of you."[106]

This testimony creates further genuine issues of material fact as to whether LSUHSC's specific reasons for including only Dr. Chaney in the "restructuring" are pretextual.

Under *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), the United States Supreme Court  held that the Plaintiff must be "given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a cover-up for a racially discriminatory decision." *Id*. at 93 S. Ct. 1826, 411 U. S. 805. Earlier in the decision, the Court observed that other evidence that may be relevant to any showing of pretext includes facts as to the Defendant's previous treatment of the Plaintiff during his employment, the Defendant's reaction, if any, to the Plaintiff's legitimate civil rights activities, the Defendant's general policy and practice with respect to minority employment, and statistics as to the Plaintiff's employment policy and practice which indicate whether

---

[106] ROA 1280.

the defendant's adverse action against the Plaintiff conformed to a general pattern of discrimination against black employees.

In *Reeves v. Sanderson Plumbing Company*, 530 U. S. 133, 120 S. Ct. 2097 (2000), the Court held that "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Id*. at 120 S. Ct. 2108, 530 U.S. 147.

> "In appropriate circumstances , the trier of fact can reasonably infer from the falsity of the explanation that the employer is disassembling to cover up a discriminatory purpose....Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision....When all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with sole  reason, based his decision on an impermissible consideration." Id. at 530 U.S. 147-148, 120 S. Ct. 2108-2109.

In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742 (1993), the Supreme Court held: "The Plaintiff may succeed...either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered justification is unworthy of credence." *Id*. at 509 U.S. 517, 113 S. Ct. 2752.

In *Vaughn v. Woodforest Bank*, 665 F. 3d 632 (5th Cir. 2011), this Court held that:

"To establish pretext, Vaughn must show that Woodforest's 'proffered explanation is false or unworthy of credence.'...The inquiry is focused on whether Woodforest's explanation, accurate or not, is the 'real reason' for firing Vaughn....Vaughn must produce evidence , viewed in the light most favorable to her, that would permit a jury to believe that Woodforest's reason for firing her was not its true reason but simply pretext for a racially discriminatory reason id. Such rebuttal evidence, combined with the prima facie case, will suffice to create a genuine issue of material fact such that summary judgment is inappropriate.... A jury could draw inferences from this evidence and reasonably conclude that Woodforest intentionally exaggerated its concern over Vaughn's 'unsatisfactory conduct' and that her workplace comments were not the real reason she was fired. On these disputed facts, the district court 'impermissibly substituted its judgment concerning the weight of the evidence for the jury's....Summary judgment was inappropriate; a jury must decide whether Vaughn's race was the real reason she was fired." Id. at 637, 638,639.

The lack of documentation of performance problems may also indicate pretext. *Burton v. Freescale Semiconductor, Inc.*, 789 F.3d 222, 240 (5th Cir. 2015); *Cantu v. Vitol, Inc.*, 2011 U.S. Dist. LEXIS 118325 (S.D. Tex., Dec. 21, 2009). Satisfactory performance is an ordinary prerequisite of continued employment, just as job qualification is an ordinary prerequisite to hiring. *McDonnell Douglas Corp. v. Green*, supra. The Plaintiff need only show that her performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him. *Flowers v. Crouch-Walker, Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977). In this case, there was significant documentation of Dr. Chaney's successful performance. This is even further

evidence of genuine issues of material fact that, the proffered explanation of "restructuring" from her employer is false and unworthy of credence.

**C.    The District Court Improperly Weighed the Evidence, Crediting Defendant's Evidence, and Discrediting Plaintiff's Evidence, which Conflicts with *Reeves v. Sanderson Plumbing Products, Inc.*, supra.**

Under *Reeves v. Sanderson Plumbing Co.*, a court is required to "give credence to the evidence favoring the non-movant." *Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133, 151. However, the court is only permitted to credit evidence favoring the non-movant if it: (i) is "uncontradicted"; (ii) is "unimpeached"; and (iii) "comes from disinterested witnesses." Id. Plaintiff respectfully submits that the District Court failed to follow *Reeves* by weighing the evidence, crediting Defendant's evidence that did not meet the three (3) criteria set forth in *Reeves*, and by failing to credit Plaintiff's evidence.

Dr. Chaney most respectfully submits the District Court improperly weighed contradicted evidence from interested witnesses and "substituted its judgment concerning the weight of the evidence for the jury's." *Id*. at 153. The District Court erred when it disregarded critical evidence in Dr. Chaney's favor in the testimony of Toya Shanklin-Jackson, which was highly probative of the employer's motive, and the fact that there was no substantial justification for "restructuring" Dr. Chaney's when her salary was approved by the CDC in the reduced budged amount.

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir.2004) established that a jury issue is presented when there is a prima facie case, together with proof from which it could be found that the "more likely reason" for the employment decision is…discrimination.  A reasonable fact finder could find that Chaney was terminated for discriminatory and retaliatory reasons. This is a question of fact for the jury. See *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (Where either lawful or unlawful inference could be drawn from act at issue, "it was error...for the District Court to resolve the disputed fact of motivation at the summary judgment stage.").

Under *Reeves*, 530 U.S. at 143, the Supreme Court has clarified that "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."  As the Court has explained:

> In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation. *Burdine*, 450 U.S. at 255 n.10 (emphasis added).

For reasons that will become clear, this proviso is highly significant in the present case, because we ultimately conclude that Stennett's strong showing of a prima facie case with respect to each position, combined with her other evidence supporting an inference of pretext, suffices to discredit TPSD's proffered explanation that it did not refuse to hire Stennett because of her age, thus rendering summary judgment inappropriate. Id. at 316.

This Court noted that the evidence the plaintiff presented of her prima facie case "and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant' explanation is pretextual." *Id*. at 317, quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255. As Dr. Chaney was engaging in protected activities with weeks prior to her termination, the temporal proximity of her termination and her protected activities should be accorded weight.

Dr. Chaney respectfully submits that the District Court "substituted its judgment concerning the weight of the evidence for the jury's." See *Reeves*, 530 U.S. at 153. The question on summary judgment is "whether a rational jury could—not probably would—conclude that the employer's proffered non-discriminatory hiring rationale is pretextual." *Stennett*, 619 F. App'x at 323-24 (emphasis in original). Taken in the light most favorable to non-movant as required by *Reeves*, this case presents a chain of circumstances from which a jury could reasonably find race discrimination.

## X.   **CONCLUSION**

The Plaintiff-Appellant, Dr. Chandre' Chaney, respectfully concludes that the District Court's grant of Summary Judgment in favor of Defendant-Appellees and denial of Plaintiff-Appellant's Motion to Alter or Amend the Judgment were erroneous and should be reversed and this case remanded for trial at the Defendants-Appellees' cost.

Respectfully submitted:


_____/s/ J. Arthur Smith, III_____
J. Arthur Smith, III (#07730)
**SMITH LAW FIRM**
830 North Street
Baton Rouge, LA 70802
Telephone: (225) 383-7716
Facsimile: (225) 383-7773
Email: jasmith@jarthursmith.com

*Counsel for Plaintiff-Appellant,*
*Dr. Chandre' Chaney*

## XI.    **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Original Brief on behalf of the Plaintiff-Appellant has this date been electronically filed with the Clerk of Court for the Fifth Circuit, and that an electronic copy is provided to counsel for the Defendant-Appellees as a standard function of that electronic filing system.

Baton Rouge, Louisiana, this 9th day of December, 2024.


_____/s/ J. Arthur Smith, III_____
J. Arthur Smith, III

## XII.    **CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 10,619 words, excluding the parts of this brief exempted by FED R. APP. P 32(f) **_or_** this brief uses a monospaced typeface and contains lines of text excluding the parts of the brief exempted by FED R. APP. P. 32(f).

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 or later in Times New Roman 14 point font or this brief has been prepared in a monospaced typeface.

Baton Rouge, Louisiana, this 9th day of December, 2024.

_____/s/ J. Arthur Smith, III_____
J. Arthur Smith, III